# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| BETHANY PELLETIER, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 13-651ML |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

Plaintiff Bethany Pelletier was in the subway under Tower One in New York City on 9/11; since she has suffered from post-traumatic stress disorder ("PTSD") with panic attacks, which have exacerbated pre-existing anxiety and depression, in addition, she has developed sarcoidosis, a seizure disorder and back pain following a fall caused by a seizure that resulted in a spinal fracture. She applied for Disability Insurance Benefits ("DIB") on July 8, 2010, claiming that she has been unable to work since November 20, 2009. Tr. 18, 207, 214, 241. She has filed a motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner") denying DIB under 42 U.S.C. § 405(b), arguing that the decision of the Administrative Law Judge ("ALJ") is erroneously grounded in outdated state agency opinions and ignores more recent treating source opinions, so that the ALJ's residual functional capacity ("RFC")[1] finding is not supported by substantial evidence. Defendant Carolyn W. Colvin ("Defendant") has filed a Motion for an order affirming the Commissioner's decision.

---

[1] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting." 20 C.F.R. § 404.1545(a)(1).

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). I find that the Commissioner's decision that Plaintiff is not disabled legally correct and well supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 8) be DENIED and Defendant's Motion to Affirm the Decision of the Commissioner (ECF No. 12) be GRANTED.

## I. **Background Facts**

Plaintiff graduated from high school and attended an art college for two years. Tr. 242. She worked as an administrative assistant for several different companies, Tr. 46, 65, 243, and was employed in New York City on September 11, 2001; she was exposed to the horror of that day, as well as to the noxious matter that filled the air in the aftermath of the collapse of the Towers. Tr. 41, 354. In 2004, she returned to Rhode Island and continued to work as an administrative assistant until November 20, 2009, when she went to the emergency department of Arbour-Fuller Hospital for panic attacks and depression; she was referred to Butler Hospital, where she was partially hospitalized from December 3, 2009, until December 11, 2009. Tr. 120, 129, 243, 371, 386, 392. As a result of this interruption, she lost her job and never returned to work, although she collected unemployment benefits and continued to look for work near her home (because she could not drive) through March 2012. Tr. 45-46, 236. She was thirty-three years old as of the date of alleged onset. Tr. 30, 207, 214.

While Plaintiff attributes her inability to work mostly to her mental impairments, Tr. 46, she also faces significant physical challenges. As a result of the exposure on 9/11, she was diagnosed with sarcoidosis in 2005,[2] which has affected her lungs, lymph nodes and spread to

---

[2] Sarcoidosis is a disease that leads to inflammation in various organs resulting in the formation of granulomas that can affect how the organ works. Sarcoidosis usually starts in the lungs, skin or lymph nodes, particularly in the

her abdomen.  Tr. 41, 258, 381, 405, 409, 447, 723.   In 2008, when she was thirty-two, she experienced acute myocarditis, a heart attack, and in 2010, she developed a seizure disorder; linkage of both to sarcoidosis has been suspected but never established.  Tr. 42, 409, 538, 723. On June 17, 2010, while on her honeymoon in Florida, she had two seizures in one day, the second resulting in a fall that fractured a vertebra; the consequent back pain became worse in 2012.  Tr. 324, 327, 332, 447, 498, 513, 656.  Despite medication and counseling, Plaintiff's longtime treating psychologist believes that her mental impairments appear to be getting worse. Tr. 49, 653.

### A.    Physical Impairments

Plaintiff's seizure disorder began on June 17, 2010, while in Florida on her honeymoon, when she had two seizures, and was admitted to Celebration Hospital for three days.  Tr. 314-38. She fractured her spine when she fell down a flight of stairs during the second of the two seizures.  Tr. 315, 317.  Dr. Muhammad A. Hizkil performed a full work-up of tests, including a CT scan of Plaintiff's head on June 17, 2010, which were all normal.  Tr. 317, 490.  When she returned home, Plaintiff followed-up with Dr. Angela M. Simpson.  Tr. 340-41.  She told Dr. Simpson that she had been taking three to four Lorazepam daily leading up to her wedding, but forgot to bring the medication on the honeymoon resulting in the hypothesis that the seizures could have been caused by withdrawal from Lorazepam.  Tr. 341.  Later that month, she was examined by Dr. James C. Lisak, a neurologist, who agreed it was possible the seizures were due to medication withdrawal.  Tr. 348.  Plaintiff failed to appear for her next scheduled appointment with Dr. Lisak, and did not follow through with recommended testing.  Tr. 348-49.

---

chest, and can also affect the heart, brain, eyes and liver.  What is Sarcoidosis, NIH, National Heart, Lung, and Blood Institute, www.nhlbi.nih.gov/health/health-topics/sarc (last visited Dec. 12, 2014).

On August 17, 2010, Plaintiff consulted with Dr. Susanne J. Patrick-MacKinnon about her seizures, who agreed that they were likely due to medication withdrawal and possibly sleep deprivation. Tr. 475-76. However, on October 27, 2010, Plaintiff reported another seizure while packing for a trip; although she felt disoriented, she did not go to the emergency room. Tr. 404, 419. In June 2011, Plaintiff saw Dr. Patrick-MacKinnon about yet another seizure that caused her to break off a tooth; she also reported increased unsteadiness, resulting in a fall into a campfire that led to serious burns. Tr. 637. A month later, she had another seizure and Dr. Patrick-MacKinnon noted that the seizure history no longer seemed clearly linked to withdrawal from benzodiazepines, Tr. 669-70, although Plaintiff was warned to be careful to wean herself slowly off such medications if she decided to stop taking them. Tr. 671. Plaintiff had seizures in August 2011 and possibly another in September; however, after August/September 2011, Plaintiff's seizure medication appeared to be controlling the seizure disorder; as of the most recent records available, she had not had any more seizures. Tr. 673; see Tr. 690 (primary care physician, Dr. Cristine Pacheco, opines that "seizure d/o fairly stable").

For sarcoidosis, which had been diagnosed in 2005, Plaintiff was followed by Dr. Dennis McCool. Tr. 405. Since it affected her lungs, this consisted primarily of pulmonary function tests. For example, testing at Memorial Hospital on September 8, 2010, showed no evidence of an obstructive or restrictive ventilatory defect, though her total lung capacity was mildly reduced, possibly due to sarcoid process. Tr. 409. In light of the seizures and 2008 heart attack, Dr. McCool also focused on Plaintiff's heart and brain. However, a brain MRI in September 2010 showed no abnormalities, Tr. 410-11, and a December 2010 CT scan of the chest and abdomen was essentially unchanged since the last scan. Tr. 428-29. In February 2011, Plaintiff told Dr. McCool that she felt okay, and was not experiencing increased shortness of breath, Tr.

573, while in September 2011, her only pulmonary symptom was mild exertional dyspnea, and findings on examination (both physical and mental) were normal. Tr. 681-82. Pulmonary function tests showed mildly reduced diffusion capacity, but no obstructions or restrictions. Tr. 685. During follow-up in February 2012, pulmonologists Dr. Richard Beasley and Dr. Barry L. Fanburg recorded that her seizure disorder finally seemed well controlled and that she had not taken Prednisone for sarcoidosis since July 2011, yet had not had any increase in symptoms and seemed "slightly better overall." Tr. 716. No further treatment of sarcoidosis was recommended, with follow-up recommended in one year. Tr. 717.

After treatment for the spinal fracture in 2010, the record has few references to back pain until March 2012, when Plaintiff was seen by Dr. Rocco at the Brain and Spine Neurosurgical Institute for low back pain radiating to both buttocks; Plaintiff rated the pain as 9 out of 10 and persisting for three months. Tr. 737. Examination revealed tenderness along the midline of her spine and over the right sacroiliac joint, and pain with range of motion, although her sensory, reflex and motor findings and gait and limb coordination were normal. Tr. 737-38. An MRI of Plaintiff's lumbar spine, compared with a CT from July 2007, showed minimal lower lumber degenerative changes, but the lumbar vertebrae were normal in height, there were no concerning marrow changes, and no critical stenosis. Tr. 739-40. In April and May 2012, Plaintiff was treated with a series of three spinal injections, Tr. 743, 745, 747; otherwise, exercise was recommended "to avoid surgical intervention." Tr. 748. At the ALJ hearing, she said she was considering surgery but did not need a cane and was going to the gym to exercise. Tr. 56-57.

On May 5, 2012, Plaintiff's primary care physician, Dr. Christina Pacheco, filled out a Physical RFC Questionnaire, opining that Plaintiff lacks the capacity for sitting, standing and walking as necessary for sedentary work and could not withstand the demands of even a low-

stress job.  Tr. 730-34.  However, Dr. Pacheco also opined that both sarcoidosis and the seizure

disorder were stable and that back pain treatment was ongoing (Plaintiff had not yet had the third

in the series of spinal injections).  Tr. 730.  Dr. Pacheco limited the scope of her opinion, noting

that the specialists involved in Plaintiff's care would be in a better position to evaluate and that

she would defer to Dr. Brown (treating psychologist) and Dr. Rocco (overseeing management of

spinal pain).  Tr. 731, 733.

### B. Mental Impairments

While there are no medical records from earlier periods, Plaintiff's history as provided to

current providers indicates that anxiety and depression are longstanding mental health issues that

she has struggled with all her life.  Her documented mental health history begins on December 3,

2009, when she was admitted to the partial hospitalization program[3] at Butler Hospital for

anxiety, depression, insomnia and PTSD due to her proximity to the World Trade Center on

September 11, 2001.  Tr. 374, 384.  At Butler, she was treated by Dr. Melissa A. Ludwig; when

she was discharged, Plaintiff reported that her mood was "pretty good," although she exhibited

some anxiety and was assessed with a Global Assessment of Functioning ("GAF")[4] score of 45.

Tr. 382, 387.  On January 10, 2010, Dr. Ludwig observed that Plaintiff's anxiety had improved,

---

[3] Partial hospitalization is a structured program of outpatient psychiatric treatment provided as an alternative to inpatient psychiatric care.  Mental Health Care (Partial Hospitalization), www.medicare.gov/coverage/partial-hospitalization-mental-health-care.html (last visited Dec. 12, 2014).

[4] A GAF score between 41 and 50 indicates "serious impairment in social, occupational, or school functioning," while one between 51 and 60 indicates "moderate difficulty in social, occupational, or school functioning."  See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013)). ("DSM–5").  The Social Security Administration Administrative Message (identification number AM–13066, effective date July 22, 2013) makes clear that adjudicators may continue to receive and consider GAF.

though Plaintiff was depressed. Tr. 371. On January 28, 2010, Dr. Lauren Mercer of Butler performed another psychiatric evaluation and assigned a GAF score of 60.[5] Tr. 373.

On April 2, 2010, psychiatrist Dr. Gregg Etter took over as Plaintiff's treating psychiatrist. He evaluated Plaintiff, who reported symptoms of depression, anxiety and insomnia, though she was not suicidal but was not working and had no plans to return to work. Tr. 440-41. Dr. Etter diagnosed major depression and an anxiety disorder and assigned a GAF score of 60.[6] Tr. 442. In October 2010, Plaintiff told Dr. Etter that her mood was okay but low and that she had no suicidal thoughts and was sleeping "ok." Tr. 433-34. In January 2011, Plaintiff told Dr. Etter that she had not had any seizures since the preceding August; while she reported distress over the recent suicide of a friend and low mood, she reported that she was reading and walking her dogs. Tr. 432.

Plaintiff also was treated by Dr. Dorothy Brown, a psychologist who saw her ten times in 2010, three times in 2011 and four times in 2012. Tr. 562, 589-602, 749-60. Dr. Brown's notes reflect Plaintiff's struggles in relating to family members and anxiety in preparing for her own wedding and an anniversary party; they reference sleeping difficulties and panic attacks, but also that, by November 2010, she was sleeping better, her thinking was clear and she "had a good day." Tr. 591. However, in the spring of 2011, Dr. Brown reported that Plaintiff's depression had increased due to the seizures and the isolation they caused and that Plaintiff reported that she was having multiple panic attacks and difficulty getting to treatment appointments. Tr. 562. In June 2011, Dr. Brown noted, "in a constant state of crying – panic," but also "has had some friends over." Tr. 589, 751. After the seizures seemed under control, at the end of 2011, Dr. Brown noted that Plaintiff was planning to work as a volunteer for Paws Rescue. Tr. 752. Dr.

---

[5] See n.4 *supra*.

[6] See n.4 *supra*.

Brown's notes from the spring of 2012 reflect Plaintiff's loneliness because of living in a rural area and not yet cleared to drive, her coping with back pain, which was being treated, and her concerns over the upcoming ALJ hearing. Tr. 759-60. The only mental status examination in Dr. Brown's records refers to no abnormalities. Tr. 602.

On April 5, 2012, Plaintiff began counseling with Sarah Buck-Herdrich, M.S. R.N. PMHCNS-BS, a psychiatric nurse specialist. Tr. 657. She had an intake meeting and one session with Ms. Buck-Herdrich before the hearing, during which Plaintiff reported that she was sleeping well on her current medications; she took the dogs out in the morning, but was able to get back to sleep, though her mood was "up and down." Tr. 656. Her mental status examination recorded no abnormalities except for memory, but there is no description of the level of impairment. Tr. 662. Although Plaintiff reported that she was still having panic attacks, Ms. Buck-Herdrich's notes state that Plaintiff was "generally coping well" despite the recent onset of back pain. Tr. 656.

On June 21, 2011, Dr. Brown filled out a Mental RFC Questionnaire. She opined that Plaintiff is unable to meet competitive standards or has no useful ability to function as to most of the mental abilities needed for unskilled work. Tr. 643-46. She also noted that Plaintiff would likely miss more than four days of work per month. Tr. 647. Her opinion was based in part on her belief that the seizures were not yet controlled and that side effects of sarcoidosis would prevent Plaintiff from working at any job. Tr. 643, 645. Ten months later, on April 18, 2012, despite having seen Plaintiff sporadically since 2010 and with no evidence of a mental status examination or clinical testing, Dr. Brown opined that Plaintiff suffered from memory deficits, difficulty thinking and limitations with concentration such that she could not perform even simple or routine work. Tr. 651-53. After Plaintiff's second visit on June 7, 2012, Ms. Buck-

Herdrich filled out a Mental RFC Questionnaire indicating that Plaintiff would not be able to perform even simple work; however, her RFC form also notes that "pt new to me" and that in response to treatment, Plaintiff was "generally coping well despite medical issue." Tr. 762-66.

## II.     Travel of the Case

Plaintiff filed her DIB application on July 8, 2010, based on the claim that she has been unable to work since November 20, 2009, due to grand mal seizures, depression, anxiety, insomnia, a panic disorder and a fractured bone in her lower back. Tr. 207, 214, 241. The Commissioner denied Plaintiff's claims initially on February 16, 2011, and on reconsideration on June 24, 2011. Tr. 150-52, 157-59.

In connection with Plaintiff's application, on November 10, 2010, she underwent a consultative psychological evaluation by state agency psychologist Dr. Louis A. Cerbo. Tr. 423. His mental status and neurobehavioral observations were largely normal, except for occasional circumstantial thought processes (possibly due to anxiety) and mild-to-moderate attention and concentration deficits. Tr. 425. Based on Plaintiff's history, Dr. Cerbo diagnosed recurrent major depression and PTSD and assigned a GAF score of 47.[7] Tr. 426. During the clinical interview, Plaintiff told Dr. Cerbo that she can clean, shop, cook, pay bills and use public transportation, though not always on a consistent basis, that she enjoys reading and painting, but that, because of the seizure disorder, she is unable to drive. Id. Dr. Cerbo found her prognosis guarded to fair, noting that she appears to have "complicated issues related to her anxiety and depression in addition to the emergence of a seizure disorder that significantly affects her everyday functioning at this time." Id.

On May 23, 2011, Dr. Edward R. Hannah, a non-examining state agency consulting physician, reviewed Plaintiff's medical records and found that Plaintiff had a history of

---

[7] See n.4 supra.

pulmonary sarcoidosis but that she had not had a seizure since 2010; the records he reviewed

apparently did not include the seizure mentioned in a record from April 2011 that caused her to

break a tooth.  See Tr. 142-44, 582.  Dr. Hannah completed a Physical RFC Assessment, opining

that Plaintiff's limitations included avoiding concentrated exposure to extreme cold, moderate

exposure to respiratory irritants, and avoiding all exposure to hazardous working conditions.  Tr.

142-44.  On June 21, 2011, J. Stephen Clifford, Ph.D., a non-examining state agency

psychological consultant, reviewed Plaintiff's medical records and completed a Mental RFC

Assessment form, opining that Plaintiff can sustain attention and concentration for completion of

simple procedures, based on her ability to complete household chores and that she can complete

a normal work day and work week.  Tr. 132-48.

## III.     The ALJ's Hearing and Decision

On July 11, 2012, the ALJ conducted the hearing, at which he heard testimony from

Plaintiff and a vocational expert ("VE"); Plaintiff's attorney was present.  Tr. 39-70.

Plaintiff testified that, since her medication was "switched . . . around a little bit," she had

been seizure-free for almost a year, and that she expected to get her driver's license back soon.

Tr. 44.  She admitted that she had collected unemployment and had continued to look for work

until March 2012.  Tr. 45.  She reported that her daily activities include caring for and walking

her dogs, making breakfast, checking e-mail, watching television, cleaning the house, cooking,

and doing laundry.  Tr. 52-54, 60-61.  She walks "a lot" and went to a gym for a while and used

the treadmill.  Tr. 57.  Plaintiff described how she and her husband host cookouts at their rural

home; most recently they had a birthday party for her husband held two weeks before the hearing

that "was a good one.  A lot of . . . people camped over that night . . . .  It was fun."  Tr. 54-55.

Plaintiff testified that the primary issues preventing her from working are mental health-related, although back pain has recently become a new impediment; back surgery has been suggested and she is deciding whether to proceed with it. Tr. 46-47, 56. For example, she explained that she has "no short-term memory whatsoever right now," and that the seizure medication has made her clumsy, causing her to fall several times. Tr. 48-49. While she has been depressed for many years (even when she was working as a receptionist she felt isolated and "panicky"), it has worsened in recent years; with medication, she has three panic attacks a week, which resolve in approximately thirty minutes with Klonopin. Tr. 50-51, 57-59. At least once a month, she is so depressed that she isolates herself in her room. Tr. 60.

Following Plaintiff's testimony, the ALJ questioned the VE, Ms. Estelle Hutchinson, who testified that Plaintiff's prior work was sedentary but skilled. Tr. 65-69. The ALJ then asked the VE to consider:

> a hypothetical claimant, this Claimant's same age, education and work experience. The hypothetical claimant would be limited to lifting and carrying 20 pounds occasionally (10 pounds frequently); would be limited to standing and walking four hours in an eight-hour work day, but could sit at least six hours in an eight-hour work day; could occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop; frequently kneel; frequently crouch; and, occasionally crawl; would have to avoid concentrated exposure to extreme cold; and, would have to avoid all exposure to hazardous machinery and heights; and would have to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation. [The] hypothetical claimant would also be limited to understanding, remembering, and carrying out only simple, routine tasks and instructions, but could keep pace, sufficient to complete tasks and any quotas found in simple, routine, unskilled work; and, could tolerate only simple, routine changes in a work setting.

Tr. 65-66. The VE responded that the hypothetical individual could not perform Plaintiff's past work, but could perform other simple and routine sedentary and light work available in the local and national economy; she identified inspector and hand packager positions as examples. Tr. 66. However, with the addition of any one of such limitations as the inability to carry out simple

routine tasks, the inability to interact with co-workers and supervisors, the inability to tolerate customary work pressures, or four absences a month, no work would be available.  Tr. 67.

In his decision, the ALJ determined at Step One that Plaintiff had not engaged in substantial gainful activity since November 20, 2009, the alleged disability onset date.  Tr. 20. At Step Two, the ALJ determined that Plaintiff suffered from the following severe impairments: "seizure disorder, sarcoidosis, status-post acute nondisplaced fracture of the right L4 transverse process, major depressive disorder, and PTSD."  Tr. 20-21.  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or was medically equivalent to any Listing.  Tr. 21-22.

At Step Four, the ALJ determined that Plaintiff has the RFC to perform light work with the following limitations:

> [The claimant] can lift and carry 20 pounds occasionally and 10 pounds frequently and sit at least 6 hours in an 8-hour work day except that she is limited to standing or walking for a total of four hours in an eight-hour day.  The claimant can occasionally climb ramps and stairs, stoop, and crawl.  She can never climb ladders, ropes, or scaffolds.  She can frequently kneel and crouch.  The claimant must avoid concentrated exposure to cold; must avoid all exposure to hazardous machinery and heights; and must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation.  The claimant is limited to understanding, remembering, and carrying out simple, routine tasks and instructions, but she can keep pace sufficient to complete tasks and meet quotas found in simple, routine, unskilled work.  The claimant can tolerate only simple, routine changes in a work setting.

Tr. 22.  In making this finding, the ALJ considered Plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with opinion evidence, the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p.  Id.  The ALJ further determined that Plaintiff could not perform her past relevant work as an administrative assistant.  Tr. 30.  At Step Five, after considering the evidence, the

ALJ determined that Plaintiff was not disabled as defined by the Act from November 20, 2009, through the date of the decision.  Tr. 18, 31.

The Appeals Council denied Plaintiff's request for review on August 2, 2013, thus making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

**IV.**    **Issues Presented**

Plaintiff makes the following arguments:

1.  The ALJ failed properly to evaluate the treating source opinions of Dr. Brown and Dr. Pacheco as well as the "other medical source" opinion of Plaintiff's therapist, relying instead on outdated state agency reviewing opinions.

2.  Substantial evidence does not support the ALJ's RFC finding.

3.  The ALJ failed to obtain medical expert testimony and, therefore, did not fully develop the record.

**V.**    **Standard of Review**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for failure to submit the evidence at the administrative level. See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

## A.      Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must

nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

A treating source who is not a licensed physician or psychologist[8] is not an "acceptable medical source." 20 C.F.R. § 404.1513; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist. Id. at *5. Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file. Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to

---

[8] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC, <u>see</u> 20 C.F.R. §§ 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); <u>see also</u> <u>Dudley v. Sec'y of Health & Human Servs.</u>, 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

## B.      Developing the Record

Social Security proceedings are "inquisitorial rather than adversarial." <u>Sims v. Apfel</u>, 530 U.S. 103, 110-11 (2000); <u>Miranda v. Sec'y of Health, Educ. & Welfare</u>, 514 F.2d 996, 998 (1st Cir. 1975) (social security proceedings "are not strictly adversarial"). The ALJ and the Appeals Council each have the duty to investigate the facts and develop the arguments both for and against granting benefits. <u>Sims</u>, 530 U.S. at 110-11. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. <u>Evangelista</u>, 826 F.2d at 142. Courts in this Circuit have made few bones about the responsibility that the Commissioner bears for adequate development of the record. <u>Id.</u>; <u>see</u> <u>Deblois v. Sec'y of Health & Human Servs.</u>, 686 F.2d 76, 80-81 (1st Cir. 1982); <u>Currier v. Sec'y of Health, Educ. & Welfare</u>, 612 F.2d 594, 598 (1st Cir. 1980).

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; <u>see also</u> <u>Conley v. Bowen</u>, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling this duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. <u>Carrillo Marin v. Sec'y of Health & Human Servs.</u>, 758 F.2d 14, 17 (1st Cir. 1985).

### C.    The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 404.1520.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 404.1520(e)-(f).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted.  Id. § 404.1520(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3), 423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for

disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human
Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### D.  Evaluation of Mental Illness Claims

The evaluation of a claim of disability based on mental illness requires use of a
psychiatric review technique that assesses impairment in four work-related functions: (1)
activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4)
episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The review technique is used to rate
the severity of mental impairments at Steps Two and Three of the sequential evaluation process,
and also serves as the backdrop for the more detailed mental RFC assessment at Step Four.  See,
e.g., Wells v. Colvin, 727 F.3d 1061, 1069 (10th Cir. 2013); SSR 96-8p, 1996 WL 371184 (July
2, 1996).  The ALJ must incorporate pertinent findings and conclusions based on the technique
into his decision and must include a specific finding as to the degree of limitation in each of the
four functional areas.  Id. § 404.1520a(e)(4); Carolyn Kubitschek & Jon Dubin, Social Security
Disability Law & Procedure in Federal Court § 5:38 (2014).

### E.  Capacity to Perform Other Work

Once the ALJ finds that a claimant cannot return to the prior work, the burden of proof
shifts to the Commissioner to establish that the claimant could perform other work that exists in
the local or national economy.  Seavey, 276 F.3d at 5.  To meet this burden, the ALJ must
develop a full record regarding the vocational opportunities available to a claimant.  Allen v.
Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through
reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive
reliance on the grids is appropriate where the claimant suffers primarily from an exertional
impairment, without significant non-exertional factors.  Id. (exclusive reliance on the grids is

appropriate in cases involving only exertional impairments, impairments which place limits on

an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate

when a claimant is unable to perform a full range of work at a given RFC or when a claimant has

a non-exertional impairment that significantly limits basic work skills. Nguyen, 172 F.3d at 36.

In almost all of such cases, the Commissioner's burden can be met only through the use of a

vocational expert. Heggarty v. Sullivan, 947 F.2d 990, 996 (1st Cir. 1991). It is only when the

claimant can clearly do unlimited types of work at a given RFC that it is unnecessary to call a

vocational expert to establish whether the claimant can perform work which exists in the national

economy. See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ

must make a specific finding as to whether the non-exertional limitations are severe enough to

preclude a wide range of employment at the given RFC indicated by the exertional limitations.

Merola v. Astrue, C.A. No. 11-536A, 2012 WL 4482364, at *5 (D.R.I. Sept. 26, 2012).

## VII. Application and Analysis

### A. The Opinion Evidence

Plaintiff's principal attack on the ALJ's decision is based on his rejection of the four

assessments from her treating psychologist, therapist and primary care physician, and relying

instead on the stale assessments of an examining psychologist and two non-examining sources,

whose work was completed before Plaintiff's seizure disorder came under control in August

2011 and before Plaintiff's back pain flared in March 2012. She contends that the treating

sources were independently derived, yet are consistent in their findings of limitations that would

preclude all work; accordingly, it is error to discount them, while affording the agency opinions,

rendered before much of the relevant evidence was submitted, what amounts to controlling

weight. See 20 C.F.R. § 404.1527; SSR 96-2p, 1996 WL 374188 (July 2, 1996).

This Court's analysis must begin with an examination whether the ALJ complied with the requirement that he give "supportable reasons" for rejecting a treating source opinion. For example, in Soto-Cedeno v. Astrue, 380 F. App'x 1, 4 (1st Cir. 2010) (per curiam), the ALJ wrongly relied on the absence of treatment notes, yet disregarded the treating physician's description of his observations of claimant and the specific memory tests he had administered to her, which happened to be similar to the tests used by the consulting psychiatrists. Id. at 3. The case was remanded based on the failure to comply with 20 C.F.R. § 404.1527. Id. at 3-4. If the ALJ has failed to support his rejection of the treating source opinions with reasons grounded in at least more than a "scintilla" of evidence, the case must be remanded for further proceedings. Richardson v. Perales, 402 U.S. 389, 401 (1971); Barr v. Colvin, No. 12-2114-JWL, 2013 WL 1308641, at *5 (D. Kan. Mar. 29, 2013).

### 1. The Psychological Opinions

Plaintiff's psychologist, Dr. Brown, provided two Mental RFC assessments regarding Plaintiff's mental impairments: one on June 21, 2011, and the other on April 18, 2012. Tr. 642, 648. The ALJ gave both of them "little weight." Tr. 28. Plaintiff correctly notes that the ALJ approached the Brown opinions with the mistaken belief that she was Plaintiff's "former treating psychologist," although the record reflects that Dr. Brown continued treating her through May 2012. Tr. 28, 749. Nevertheless, Dr. Brown herself couched her 2012 opinion with the caution that she "saw [Plaintiff] sporadically since [the end of 2010]," and limited her 2011 opinion with the notation that in 2011 "contact low." Tr. 643, 649. Accordingly, the ALJ's finding that Dr. Brown lacked "a complete understanding of claimant's current mental status" is adequately supported. Tr. 28. The ALJ also noted the inconsistency between Dr. Brown's opinion that Plaintiff could manage benefits with the opinion that she has "no useful ability to function" in

understanding, remembering or carrying out short and simple instruction.  Lee v. Astrue, No. 5:11-CV-2315-LSC, 2012 WL 4479288, at *5 (N.D. Ala. Sept. 26, 2012) (substantial evidence supports ALJ decision to give limited weight to treating physician when statement that claimant can manage benefits is inconsistent with physician's opinion on limitations).  Most importantly, the ALJ focused on the absence of any reference in Dr. Brown's treating records to a mental status examination or any testing to support the substantial cognitive, social and intellectual deficits recorded in her opinion, particularly the references to memory problems, confusion and difficulty concentrating.  Tr. 28; Havens v. Colvin, No. 3:13-CV-00600, 2014 WL 4659957, at *10 (M.D. Pa. Sept. 17, 2014) (ALJ properly discounted opinion when contradicted by the absence of abnormal objective mental status findings); Hubbard v. Comm'r of Soc. Sec. Admin., No. 3:08CV073, 2009 WL 3064654, at *8 (S.D. Ohio Sept. 21, 2009) ("in the absence of objective findings, the Commissioner is not bound by a treating physician's opinion that his patient is disabled").

Plaintiff also relies on the "other medical source" opinion of Sarah Buck-Herdrich, MS, RN, PMHCNS-BC, who became her primary therapist in April 2012.  Tr. 762.  Like Dr. Brown, Ms. Buck-Herdrich opined that Plaintiff was unable to meet competitive standards with respect to attention, working with others, task persistence, and dealing with work stress; like Dr. Brown, Ms. Buck-Herdrich opined that she would be absent more than four days per month.  Tr. 651-53, 766.  The ALJ also afforded Ms. Buck-Herdrich's opinion "little weight."  Tr. 29.  He based this determination on Ms. Buck-Herdrich's limited contact with Plaintiff (only two appointments), her treating opinion that Plaintiff was "generally coping well" and the limited nature of the treatment (appointments every two months), which is inconsistent with the intensive therapy required by a patient with debilitating depressive symptoms.  Id.  He also noted that Ms. Buck-

Herdrich's mental status examination referred only to "impaired memory," but with no description of the extent of impairment and with findings of no abnormalities in Plaintiff's thought process, thought content, perception, attention or concentration.  Id.; see Simumba v. Colvin, No. CIV.A. 12-30180-DJC, 2014 WL 1032609, at *8-9 (D. Mass. Mar. 17, 2014) (no error when ALJ enumerates a number of different reasons to afford limited weight to non-physician opinion); Martinez v. Astrue, No. 12-30075 FDS, 2013 WL 4010507, at *10 (D. Mass. Aug. 2, 2013) (ALJ not required to give "good reasons" for treatment of non-physician opinion, "[a]t most, he was obligated to explain his reasoning in a manner that is possible for subsequent reviewers to follow").

In sum, the ALJ's stated reasons for his decision to discount the mental RFC assessments of Dr. Brown and Ms. Buck-Herdrich are adequate to comply with the requirements of 20 C.F.R. § 404.1527 in that they constitute "supportable reasons" based on more than a scintilla of evidence.[9]  See Soto-Cedeno, 380 F. App'x at 4.  The remaining question, then, is whether there is error in the ALJ's reliance on the mental RFC of state agency psychologist Dr. Clifford, who based his assessment on a file review performed in June 2011, more than a year before the ALJ hearing and without access to either the RFC opinions or the 2012 treating records of Dr. Brown and Ms. Buck-Herdrich.

The expert opinion of a non-examining source like Dr. Clifford may amount to substantial evidence where it represents a reasonable reading of the entirety of the relevant medical evidence.  See 20 C.F.R. § 404.1527(e); Berrios Lopez v. Sec'y of Health & Human

_____

[9] Plaintiff asserts correctly that the Commissioner's argument adds an additional reason to discount Dr. Brown's RFC of near total disfunctionality on which the ALJ did not rely – the two GAF scores of 60, one assigned by treating psychiatrist Dr. Etter in April 2010 and the other assigned by a treating psychiatrist at Butler Hospital in January 2010.  See Tr. 373, 442.  In finding that the ALJ's supportable reasons are adequate, I do not consider this additional reason.  However, while the ALJ did not discuss these GAF scores, they are part of the medical records specifically referred to by Dr. Clifford as used to form his opinion that Plaintiff is capable of work limited to simple procedures.  Tr. 141, 145.

Servs., 951 F.2d 427, 431 (1st Cir. 1991). Even in cases where there are contrary opinions by treating sources, the ALJ may nonetheless assign greater weight to the opinion of a reviewing physician, so long as the ALJ has an adequate basis for doing so. See Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991) (ALJ may rely on assessment of nonexamining consultant and is not required to give greater weight to opinions of treating physicians on ultimate issue of disability); Disano v. Colvin, No. CA 13-707 ML, 2014 WL 5771885, at *13 (D.R.I. Nov. 5, 2014) (same).

Dr. Clifford opined in June of 2011, Tr. 142-45, and thus considered the bulk of the relevant evidence, including Plaintiff's records from her partial hospitalization at Butler Hospital, Dr. Etter's records and Dr. Cerbo's examination report, which noted her marriage, the lack of a formal thought disorder, mild to moderate attention concentration deficits and positive activities of daily living, interests and hobbies. Dr. Clifford also reviewed all of Dr. Brown's treating notes from 2010. The only treating mental health records[10] he did not see were Dr. Brown's notes from the period in 2011 and 2012, when she described her contact as "sporadic," and Ms. Buck-Herdrich's notes from two contacts in 2012, when she assessed Plaintiff as "coping well" and recorded the results of a mental status examination that noted no abnormalities except for impaired memory. These do not constitute evidence of a sustained (and material) worsening in Plaintiff's condition. Accordingly, the ALJ committed no error in his reliance on Dr. Clifford's opinion. Anderson v. Astrue, No. 1:11-CV-476-DBH, 2012 WL 5256294, at *3-4

---

[10] Of course, Dr. Clifford also did not see the mental RFC opinions that Dr. Brown and Ms. Buck-Herdrich submitted. Two of the three were prepared within several weeks of the hearing; Dr. Brown's 2012 RFC is the only source opining that Plaintiff "appears to be getting worse." Tr. 653. Because the ALJ found them to be inconsistent with the rest of the record and not entitled to significant weight, it was not error to rely on an agency opinion that did not consider them. Charbonneau v. Astrue, No. 2:11-CV-9, 2012 WL 287561, at *7 (D. Vt. Jan. 31, 2012) (not error to rely on state agency opinion when later-received evidence does not demonstrate change in claimant's status). To hold otherwise would be to require the Commissioner always to have the last word, that is, always to procure an opinion that takes the newest opinion submitted by the claimant into account. See Quimby v. Astrue, No. 12-CV-428-PB, 2013 WL 5969600, at *8-9 (D.N.H. Nov. 8, 2013).

(D. Me. Sept. 27, 2012), aff'd, No. 13-1001 (1st Cir. June 7, 2013) (no error to rely on

nonexamining opinion based on part of record when ALJ reviewed full record and reasonably

concluded claimant's status had not materially changed); see also Abubakar v. Astrue, No. 11-

10456, 2012 WL 957623, at *11-13 (D. Mass. Mar. 21, 2012) (relying on Ferland v. Astrue, No.

11-123, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011)).

## 2. The Physical Opinions

Plaintiff's primary care physician, Dr. Christina Pacheco, prepared a physical RFC

opinion on May 22, 2012. Tr. 730. It notes that both sarcoidosis and the seizure disorder are

stable, so that her opinion as to the presence of seriously disabling conditions rested on

Plaintiff's depression, anxiety and back pain, as to which she explicitly deferred to the treating

specialists. Tr. 730. The ALJ properly found this opinion inconsistent with the objective

medical evidence, particularly with Dr. Pacheco's treatment records, which consistently

described normal clinical findings. Tr. 691, 693, 695, 701.

Plaintiff's more serious argument is her attack on the ALJ's determination to rely instead

on the state agency opinion of Dr. Hanna, which was prepared on May 23, 2011, and is based on

a record that did not include Plaintiff's seizure activity in the late summer of 2011 or her back

pain in the spring of 2012. See Padilla v. Barnhart, 186 F. App'x 19, 22-23 (1st Cir. 2006) (per

curiam) (if later evidence supports the claimant's limitations, opinion developed without

reference to such evidence cannot provide substantial evidence to support the ALJ's decision to

deny benefits); SSR 96-6p, 1996 WL 374180, at *2 (July 6, 1996) (agency opinions "can be

given weight only insofar as they are supported by evidence in the case record . . . including any

evidence received at the administrative law judge and Appeals Council levels that was not before

the State agency, the consistency of the opinion with the record as a whole"). Thus, the issue is

whether the ALJ erred in finding that Dr. Hanna's reviewing source opinion was "not inconsistent with the evidence received at the hearing level, including evidence of the claimant's recent onset of back pain." Tr. 28.

Dr. Hanna's opinion was based in part on his observation that, "[i]t appears that she has not had another seizure (at least as of most recent MER [Medical Evidence of Record] dated 10-27-10)." Tr. 144. The subsequent record reveals, however, that Plaintiff had more seizures in April, July and August 2011. However, by the time of the hearing in July 2012, the seizure disorder had been under control since August 2011, Dr. Pacheco had opined that it was stable and Plaintiff confirmed that she expected to get her driver's license back soon. The ALJ correctly observed that Dr. Hanna's opinion is consistent with the evidence that anticonvulsant medication had effectively controlled Plaintiff's seizures. Tr. 28. There is no error in this conclusion. Crockett v. Astrue, No. CIV.A. 12-1178, 2013 WL 1907451, at *9 (E.D. La. Apr. 18, 2013) (ALJ did not commit error when medical record showed seizure brought under control by medication); Hepola v. Astrue, No. CIV. 07-1773PK, 2009 WL 2487072, at *5 (D. Or. Aug. 10, 2009) (same).

The more troubling omission is the lack of any reference to Plaintiff's back pain, which was not bothering her as of Dr. Hanna's record review. In accepting Dr. Hanna despite this gap, the ALJ examined the evidence pertaining to her back pain carefully and noted that the physical findings in the spring of 2012 were essentially normal, with no substantial loss of strength, mobility or motor skills, normal sensation gait, coordination and range of motion. Tr. 24. He pointed to the MRI done in March 2012, which revealed only "minimal" degenerative changes and a "minor" osteophyte that "appears to minimally abut the exiting nerve root." Id. The record also reflects that Plaintiff was prescribed a course of injections based not on the objective

findings, but rather on her belief "that her symptoms are quite severe." Tr. 742. She also was urged to exercise to increase core strength and maintain a healthy weight. Id. There is no suggestion that this back condition represents a limiting condition inconsistent with the ALJ's RFC finding that Plaintiff can perform work at the reduced range of light work. Anderson v. Colvin, No. 1:12-CV-1409 LJO-BAM, 2014 WL 641899, at *4-5 (E.D. Cal. Feb. 18, 2014) (back pain evidence consistent with RFC finding); Cooper v. Comm'r of Soc. Sec., No. 1:11 CV 2109, 2013 WL 821245, at *15 (N.D. Ohio Mar. 4, 2013) (same).

While a close call, I cannot conclude that the omission of back pain from Dr. Hanna's opinion renders it inconsistent with the record as a whole. See Padilla, 186 F. App'x at 21-23 (remand ordered because ALJ relied on opinion formed before claimant's suicide attempt and diagnosis of rheumatoid arthritis); Anderson, 2014 WL 641899, at *5 (ALJ's RFC finding that addressed back pain consistent with record as a whole); Mastrianni v. Astrue, No. CA 10-229 M, 2011 WL 3421543, at *7-8 (D.R.I. July 13, 2011) (proper to credit state agency opinion when consistent with record as a whole). Accordingly, I find no error in the ALJ's reliance on Dr. Hanna's opinion despite the lack of a complete record at the time it was prepared.

### B. RFC Inclusion of Attention/Concentration Limitation

Agency examining psychologist Dr. Cerbo opined that Plaintiff has attention problems, which Dr. Clifford incorporated into his mental RFC opinion: that "sustained attn/conc is adequate for completion of simple procedures only," but also that, "if limited to simple procedures, could typically complete a normal eight hour work day and normal work week." Tr. 145. Plaintiff argues that the ALJ omitted this limitation from the hypothetical posed to the VE, leaving the RFC finding lacking substantial evidence to support it. This argument is not availing. The ALJ expressly incorporated into his hypothetical the precise limitation identified

by Dr. Clifford: "assume a hypothetical claimant . . . limited to understanding, remembering , and carrying out only simple, routine tasks and instructions, but could keep pace, sufficient to complete tasks and any quotas found in simple, routine, unskilled work."  Tr. 65-66; see Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities"); Viveiros v. Astrue, No. 06-419T, 2009 WL 196217, at *7 (D.R.I. Jan. 23, 2009) (ability to maintain attention and concentration for extended periods typically not required for unskilled work); see also Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) ("ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [plaintiff's] deficiencies in concentration, persistence or pace").  The ALJ's RFC finding is well supported by substantial evidence.

## C.      ALJ's Duty to Develop Record

Plaintiff argues that when facing physical and mental impairments arising out of a complicated history of illness as has afflicted Plaintiff, the ALJ should have asked a medical expert to testify to avoid making medical judgments that are beyond the capacity of a lay person. See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 19 (1st Cir. 1996); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1991) (per curiam).  In Manso-Pizarro, the court held that, "[w]ith a few exceptions (not relevant here), an ALJ, as a lay person, is not qualified to interpret raw data in a medical record."  Id. at 17.  However, the court went on to make clear that, where medical evidence shows relatively little physical impairment, an ALJ can render a common sense judgment about functional capacity even without a physician's assessment.  Id.

Here, the only evidence that the ALJ interpreted without the assistance of a medical opinion is that reflecting back pain treatment in 2012. However, given the lack of proof of any serious physical impairment reflected in those records, I find that the ALJ was within the zone of permissible discretion in not developing the record further. Rodriguez Pagan, 819 F.2d at 5 ("Use of a medical advisor in appropriate cases is a matter left to the [Commissioner's] discretion; nothing in the Act or regulations requires it."); 20 C.F.R. § 404.1527(e)(2)(iii) ("[a]dministrative law judges may also ask for and consider opinions from medical experts"). I find no error in the ALJ's failure to call for medical expert testimony.

**VIII.  Conclusion**

I recommend that Plaintiff's Motion for Reversal of the Disability Determination of the Commissioner of Social Security (ECF No. 8) be DENIED and Defendant's Motion to Affirm the Decision of the Commissioner (ECF No. 12) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 15, 2014